# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM T. LEMMON, SR., | ) | CASE NO. 5:16-cv-2356 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| CITY OF AKRON, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion of defendants, City of Akron ("City"), James Nice ("Chief Nice"), and Brian Armstead ("Sergeant Armstead"), for summary judgment. (Doc. No. 24 ["MSJ"].) Plaintiff, William T. Lemmon, Sr. ("Lemmon Sr."), opposes the motion (Doc. No. 27 ["Opp'n"]), and defendants have filed a reply. (Doc. No. 31 ["Reply"].) For the reasons to follow, defendants' motion for summary judgment is **GRANTED**.

## I. BACKGROUND

In this civil rights action, Lemmon Sr. challenges the actions of the City and its officers in the shooting death of his son, William R. Lemmon ("William"). On September 25, 2015, City police officers responded to a report over the police radio that the Bista Brothers Grocery on North Main Street in Akron, Ohio had been robbed. Dispatch reported that there were two alleged assailants, one white and the other black, and that one of the men had displayed a gun during the robbery. Both men fled the scene through a parking lot. (Doc. No. 24-2 (Affidavit of Sergeant Brian Armstead ["Armstead Aff."]) ¶¶ 2, 5-6; Doc. No. 24-3 (Affidavit of Officer Dawn Forney ["Forney Aff."]) ¶¶ 3, 6; Doc. No. 24-1 (Declaration of David Whiddon

["Whiddon Decl."]) ¶ 5, Item 2, Akron Police Department radio traffic from Sept. 25, 2015 ["Dispatch Recording"]); Opp'n at 198-99,[1] citing Dispatch Recording.) With respect to the description of the white assailant, eyewitnesses reported that he was approximately 5"7' to 5"8', between the ages of 20-25, and wearing either a red t-shirt and jeans or a black t-shirt with white trim and black pants. (Opp'n at 198-99, citing Dispatch Recording.)

The City dispatched officers to the scene. Sergeant Armstead was one of the City officers to respond. (Armstead Aff. ¶ 6.) Having heard over the radio that the suspects had fled south, Sergeant Armstead proceeded to patrol the area south of the robbery. (*Id.* ¶ 7.) Sergeant Armstead remembered an officer reporting over the radio that a witness had seen the suspects jump over a fence and head southbound towards the area where Sergeant Armstead was searching. (*Id.*) He also remembered that, at the time, another officer reported that one of the suspects left the area on a bike and that tire tracks had been located at the scene. (*Id.*)

Sergeant Armstead soon spotted a man riding a bicycle, and it is undisputed that this man was William. Sergeant Armstead contacted dispatch to receive a current description of the assailants, and, other than the fact that the cyclist was wearing a blue jacket and a beanie on his head, the man fit the description of the white assailant. (*Id.*) Sergeant Armstead noticed that the man "had his hand holding something at the side of his coat, almost like he was concealing something under his coat." (*Id.* ¶ 8.) "This heightened [Sergeant Armstead's] awareness[,"] and he "never lost sight of [William]." (*Id.*) Sergeant Armstead reported William's description and location over the radio. (*Id.*)

Officer Dawn Forney ("Officer Forney") was one of the first officers to arrive at the

---

[1] All page numbers are to the page identification number generated by the Court's electronic docketing system.

location reported by Sergeant Armstead. (*Id*. ¶ 9; *see* Forney Aff. ¶ 6.) Officer Forney observed William riding his bike and followed him into the parking lot. (Forney Aff. ¶ 6.) When she confirmed that she was following the correct person, she continued to follow him, and reported on the radio that she was behind the suspect in a parking lot located in an alley behind a bar. She turned on her lights and siren, but William did not immediately stop. (*Id*.)

By the time Sergeant Armstead pulled into the parking lot, William had stopped in front of Officer Forney's car, and Officer Forney was already out of her vehicle with her weapon drawn. (Armstead Aff. ¶ 9.) After pulling his vehicle alongside Officer Forney's cruiser, Sergeant Armstead exited his vehicle, drew his weapon, and took a position that was approximately 10 to 15 feet from William. (*Id*. ¶ 10.) William was stopped, straddling his bike, and he had his right hand in the waistband of his pants. (Armstead Aff. ¶ 11; Forney Aff. ¶ 7.) Officer Forney and Sergeant Armstead began to shout at William, instructing him to get his hands up and show his hands.[2] (Armstead Aff. ¶ 11; Forney Aff. ¶ 7.) William did not comply, and, instead, replied "Fuck You bitch," "Shoot me," "Shoot me bitch," "You're going to have to shoot me," and "You're going to have to kill me." (Forney Aff. ¶ 7; *see* Armstead Aff. ¶ 11.)

During this standoff several other City officers arrived on the scene, though Sergeant Armstead and Officer Forney concede that they were so focused on William and the tense situation that they were unaware of who had joined them. (Forney Aff. ¶ 7; Armstead Aff. ¶ 12.)

---

[2] Armstead recalls the two officers shouting "Let me see your hands[,]" "Put your hands up," and "Get your hands up." (Armstead Aff. ¶ 11.) Forney recalls similarly instructing William to 'Take your hands out. Let me see your hands." (Forney Aff. ¶ 7.)

There is no dispute, however, that Sergeant Raffaele Spano, Jr. ("Sergeant Spano") and Officer Robert Patrick ("Officer Patrick") eventually arrived at the location. (Doc. No. 24-4 (Affidavit of Sergeant Raffaele Spano, Jr. ["Spano Aff."]) ¶ 5; Doc. No. 24-5 (Affidavit of Officer Robert Patrick ["Patrick Aff."]) ¶ 8.) Sergeant Spano exited his vehicle, took a position between Sergeant Armstead and Officer Forney, and drew his service weapon. (Spano Aff. ¶ 5.) Noting that William was wearing black Nikes "as described over the radio," and recognizing that other officers had "lethal cover," Officer Patrick took a position between a police cruiser and a semi-truck, and had his taser out. (*Id.* ¶ 6; Patrick Aff. ¶ 9.)

William continued to ignore the officers' commands to show his hands and to advise the officers that they were going to have to kill him. (Spano Aff. ¶ 7; Forney Aff. ¶ 11.) Sergeant Armstead averred that he was especially concerned for the safety of Officer Forney because she was closer to William than he was. (Armstead Aff. ¶ 11.) Sergeant Armstead believed that William was going to try to flee, when William actually "took an aggressive step in [his] direction with his hand still down at his waist, and [Sergeant Armstead] fired [his] weapon" four times. (*Id.* ¶ 12; Patrick Aff. ¶ 10 ["The suspect made a quick move towards Sergeant Armstead, like he was going to get off the bike."].) Officer Patrick fired his taser at the same moment Sergeant Armstead discharged his revolver. (Patrick Aff. ¶ 11.) Similarly, other officers reported that William "suddenly" dropped his bike immediately prior to Sergeant Armstead and Officer Patrick discharging their weapons at William. (Forney Aff. ¶ 7; Spano Aff. ¶¶ 8-9.)

Sergeant Armstead averred that he fired his weapon because he knew that a gun had been used in a robbery, and William's conduct—riding his bike one handed, like he was concealing something, and keeping his hands in the front of his pants with "his elbow raised in a manner

consistent with what someone is going to do if he is going to draw a weapon from a concealed position"—suggested that William could use a weapon on the officers. (Armstead Aff. ¶ 14.) He explained that, "[a]t the moment when [William] took an aggressive step towards [him], . . . [he] feared that [he] had to do something because [William's] behavior was way too aggressive and [he] was not going to allow [William] to draw a weapon and shoot at [him] or another officer. At that moment [Sergeant Armstead] feared for [his] own safety, and the safety of the other officers. So, [he] fired [his] weapon." (*Id.*)

Propelled by the force of the shots, William fell forward on his chest, laying on both of his hands. (Armstead Aff. ¶ 14; Forney Aff. ¶ 8; Spano Aff. ¶ 10; Patrick Aff. ¶ 12.) Officers moved closer to William and placed handcuffs on him. (Armstead Aff. ¶ 16; Fortney Aff. ¶ 8.) One officer started chest compressions until the paramedics arrived. (Fortney Aff. ¶ 9.) William was transported to the hospital where was pronounced dead. It is undisputed that no weapon was ever recovered from William's person or from the scene. (Spano Aff. ¶ 10.)

David Whiddon, a Lieutenant with the Akron Police Department and assigned to the Investigative Subdivision, Detective Bureau, Crimes Against Persons Unit, conducted a criminal homicide investigation into the shooting death of William. (Whiddon Decl. ¶¶ 2-3.) As part of the investigation, an autopsy was performed, and the medical examiner documented gunshot wounds to William's chest, right upper abdomen, right hip, right upper thigh, and right wrist. (*Id.* ¶ 6.) The officers who were present at the scene of the shooting were also interviewed, and a file was created containing evidence from the scene, witness statements, and audio and video recordings. (Doc. No. 31-2 (Declaration of David Whiddon ["Whiddon Decl. I"]) ¶ 5.) The results of the investigation were presented to the Summit County, Ohio Prosecuting Attorney,

who concluded that Sergeant Armstead did not violate any federal or state laws in his use of force against William, and that he was legally justified in using deadly force. (Whiddon Decl. ¶ 7.) No charges were brought against Sergeant Armstead or any other officer as a result of the shooting.

On September 23, 2016, Lemmon Sr., as the co-administrator of William's estate, brought suit in this Court against defendants. The complaint raises federal claims against Sergeant Armstead, under 42 U.S.C. § 1983, for excessive force and unreasonable seizure, and against the City and Chief Nice, in his official capacity, for failure to train and supervise and for ratification. It also raises state law claims against all defendants for assault and battery, intentional infliction of emotional distress, and wrongful death. (Doc. No. 1 (Complaint ["Compl."]).)

On February 15, 2017, the Court conducted a telephonic case management conference, at which time it set dates and deadlines for the case, including deadlines for expert and non-expert discovery. (Doc. No. 13 (Case Management Plan and Trial Order ["CMPTO"]).) Aside from receiving mandatory disclosures under Fed. R. Civ. P. 26, it does not appear that Lemmon Sr. conducted any discovery in this case. After the discovery deadlines had passed, defendants brought the present motion for summary judgment. The Court permitted Lemmon Sr. to file an untimely opposition brief, but refused Lemmon Sr.'s untimely request to extend the expert witness deadline. (Doc. No. 22 (Memorandum Opinion); *see* Doc. No. 20 (Plaintiff's Motion for a 30-day Extension of the Expert Witness Deadline).)

## II. STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims

asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 487 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

Under this standard, the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment motion. *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (citing *Anderson*, 477 U.S. at 247-48) (quotation marks omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citation omitted).

### III. DISCUSSION

#### A.    **Excessive Force and Unreasonable Seizure**

##### *1.    Law on Qualified Immunity and Deadly Force*

Sergeant Armstead asserts that qualified immunity protects him from liability for the federal claims of excessive force and unreasonable seizure. The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quotation marks and citation omitted). "Qualified immunity provides police officers 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, 571 U.S. 3, 6, 134 S. Ct. 3, 187 L. Ed. 2d 341 (2013)). Qualified immunity will apply "'if officers of reasonable competence could disagree on the issue.'" *Id*. (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (qualified immunity will apply unless it is obvious that no reasonably competent official would have concluded that the action was lawful).

Courts employ a two-part test to determine if qualified immunity applies. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an officer's conduct violated a constitutional right. *Ewolski*, 287 F.3d at 501; *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if a constitutional right was violated, courts must determine "whether the violation involved a clearly established

constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville & Davidson Cty.*, 486 F.3d 217, 219 (6th Cir. 2007) (quotation marks and citation omitted). If a plaintiff fails to establish either prong, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first. *See Pearson*, 555 U.S. at 236.

It is axiomatic that a citizen has a constitutional right, secured by the Fourth Amendment, not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure" of his person. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Excessive force cases are analyzed under an "objective reasonableness" standard. *Id*. at 388. Whether or not a use of force is reasonable requires balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tenn. v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (quotation marks and citation omitted). Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9); *see Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (citing *Dunigan*, 390 F.3d at 492) (further citation omitted). "This is an objective test, to be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Withers v. City of Cleveland*, 640 F. App'x 416, 419 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396).

"This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citation omitted). "Further, 'the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Sigley*, 437 F.3d at 534 (quoting *Graham*, 490 U.S. at 396-97).

An officer's use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others[.]" *Garner*, 471 U.S. at 11; *see Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly unfolding situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public.") (citations omitted). Ultimately, the plaintiff bears the burden of demonstrating that any force used was unjustified in order to establish a constitutional deprivation. *Miller v. Taylor*, 877 F.2d 469, 472 (6th Cir. 1989) (citations omitted).

2. *Defendants' Position*

As to the first prong of the qualified immunity analysis, defendants argue that each of the factors identified in *Graham* supports the conclusion that Sergeant Armstead's use of deadly force against William was objectively reasonable. First, defendants note that Sergeant Armstead and his fellow officers were responding to a report of an armed robbery, a first-degree felony under Ohio law and a severe crime. As to the second factor—active evasion and flight— defendants maintain that William refused to comply with officer commands to show his hands

and challenged the officers to shoot him. They also emphasize that William had made gestures—both on his bicycle when it appeared he was concealing something under his coat and later when he had his hands down his pants—that were suggestive that he had a weapon on his person. Still, it was not until William made an aggressive step toward Sergeant Armstead that the officer fired to prevent William from firing the weapon Sergeant Armstead and other officers believed was concealed in his pants. Given the totality of these facts, defendants insist that Sergeant Armstead had "probable cause to believe that [William] posed an imminent threat of serious physical harm to [Armstead] or his fellow officers." (MSJ at 139.)

Defendants suggest that the factual scenario surrounding the shooting is similar to that presented in *Pollard v. City of Columbus*, 780 F.3d 395 (6th Cir. 2015). There, officers engaged a suspect, who was believed to be armed and wanted on rape charges, in a high speed car chase before the suspect crashed his car, disabling it. Despite police commands to "show his hands," the suspect reached down into the car, "clasped his hands into a shooting posture, pointing them at the officers." *Id*. at 398. The officers fatally shot the suspect. The Sixth Circuit reversed the district court's decision to deny the officers qualified immunity, finding the use of deadly force objectively reasonable, given the fact that the suspect was wanted on serious rape charges, was potentially armed and was determined to avoid arrest, and the officers did not shoot until the suspect made "gestures suggesting he had a weapon[.]" *Id*. at 403. The fact that the suspect did not have a weapon did not factor into the analysis, inasmuch as the officers had no way of knowing he was actually unarmed. *See id*.

Similarly here, the officers were faced with a suspect who was non-compliant and gesturing in such a way as to suggest that he had a weapon, and his defiant threats indicated that

was determined to avoid capture. As such, when William suddenly dropped his bike and made an aggressive move toward Sergeant Armstead, the officer had probable cause to believe that he and his fellow officers were in danger. Barring genuine issues of material fact, the Court would be compelled to find, under the totality of the circumstances, that it was reasonable for Sergeant Armstead to use deadly force to protect himself and the other officers. *See Rush v. City of Lansing*, 644 F. App'x 415, 421 (6th Cir. 2016) ("Immediately before [the officer] fired the first shot, [the suspect] drew a knife and slashed at [the officer] from an arm's length away. Under those circumstances, it was not unreasonable for [the officer] to use deadly force by shooting" him); *Mullins*, 805 F.3d at 767 (the officer "was faced with a rapidly escalating situation, and his decision to use deadly force in the face of a severe threat to himself and the public was reasonable") (collecting cases).

### 3.    *Plaintiff's Position*

#### a.    <u>Spoliation</u>

Lemmon Sr. offers several reasons as to why Sergeant Armstead is not entitled to qualified immunity at this stage in the proceedings. First, he claims that defendants are guilty of spoliation because they did not preserve the footage from Sergeant Spano's dash cam. Citing the unsworn transcript from the interview of Sergeant Spano that was conducted during the ensuing criminal investigation regarding Sergeant Armstead's use of deadly force, Lemmon Sr. notes that Sergeant Spano indicated that he had a camera on his police vehicle on the day of the shooting and that he confirmed that it was functioning that day. (Opp'n at 201-02, citing Doc. No.

27-2 Transcript of Interview of Sergeant Raffaele Spano ["Spano Tr."]) at 224.)[3] Representing that the video dash cam was "indisputabl[y] … the singularly most important objective independent evidence[,]" Lemmon Sr. insists that defendants' failure to produce it as a part of Rule 26 disclosures or mention it in Sergeant Spano's affidavit represents bad faith and should result in the denial of defendants' summary judgment motion as a sanction. (*Id*. at 205-06.)

"When a party destroys evidence in anticipation of litigation, the trial court may impose sanctions for spoliation." *Applebaum v. Target Corp*., 831 F.3d 740, 744 (6th Cir. 2016) (citing *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (en banc)). "Federal law governs the determination of whether spoliation sanctions are appropriate." *Johnson v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 502 F. App'x 523, 531 (6th Cir. 2012) (citation omitted). A party seeking sanctions as a result of spoliation must establish: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed, (2) that it was destroyed with culpability, and (3) it was relevant to the party's claim or defense. *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (quotation marks and citations omitted).

---

[3] In defense of summary judgment, Lemmon Sr. relies heavily upon the transcripts from the unsworn interviews of the officers who were at the scene of the shooting. In a footnote, Lemmon Sr. argues that these transcripts constitute proper evidence on summary judgment because they were produced during discovery and represent admissions of a party under Fed. R. Evid. 801(d)(2)(c) and (d). (Opp'n at 201 n.3.) However, the Court is not convinced. "It is well established that a court may not consider hearsay when deciding a summary judgment motion." *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) (unsworn witness statements taken during police investigation were properly excluded from consideration on summary judgment) (citations omitted). Moreover, the fact that the unsworn transcripts were produced during discovery does not cure the fact that they may contain inadmissible hearsay. *See Pollino v. City of Phila.*, No. Civ. A. 30-6288, 2005 WL 372105, at *7 (E.D. Pa. Feb. 15, 2005) ("The unsworn [police] statements alleged to be incorporated by reference in the interrogatory answer are clearly nothing more than hearsay that would not be admitted at trial for substantive purposes" and are "not considered when reviewing a motion for summary judgment.") (citation omitted). Of course, it is possible that some of the interviews may be considered admissions by an agent of a party, and, thus, would fall under an exception to the hearsay rule. *Compare Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 722 (6th Cir. 2006) (statement of deputy police chief on subject of police promotions constituted an admission by a party); *with Perry v. City of Pontiac*, 254 F.R.D. 309, 316 (E.D. Mich. 2008) (rank-and-file police officers' statement would not constitute admissions by the city under Rule 801(d)(2)). Nonetheless, the Court need not reach the question of admissibility because, even if these interview transcripts are considered, they do not create fact issues that would entitle Lemmon Sr. to a trial.

Lemmon Sr. cannot meet the standard for demonstrating spoliation because he cannot establish that *any* evidence was ever destroyed, let alone establish that any destroyed evidence was relevant to his claims. Defendants have come forward with undisputed evidence that the hard drive recovered from Sergeant Spano's police vehicle, which has been preserved, did not contain any recordings or video footage of the shooting on September 25, 2015. (Doc. No. 31-1 (Affidavit of Lieutenant Richard Decatur ["Decatur Aff."]) ¶¶ 4-7.)[4] While Lemmon Sr. complains that the video was not mentioned in defendants' Rule 26 initial disclosures, Rule 26(a) would not have required defendants to produce (or reference) a video that did not depict the incident giving rise to the claims or defenses in the case. *See* Fed. R. Civ. P. 26(a)(1)(A)(ii) (requiring a party to provide "a copy – or a description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody or control and *may use to support its claims or defenses . . . .*") (emphasis added). Moreover, defendants did not fail to produce the video in discovery, which it still maintains in its possession, as Lemmon Sr. did not serve any written discovery requests. Lemmon Sr. has failed to meet his burden of demonstrating spoliation.

b.      Plaintiff Cannot Establish Questions of Fact

Turning once again to the officer interviews, Lemmon Sr. argues that there is a question of fact as to whether William made an aggressive move toward Sergeant Armstead immediately before the officer used deadly force. He notes that Officer Forney does not mention the

---

[4] Richard Decatur is employed by the Akron Police Department as the Commander of the Akron Traffic Bureau and is responsible for the department's In-car Video System ("IVS") recordings. (Decatur Aff. ¶¶ 2-3.) He avers that, on September 25, 2015, the hard drive was removed from Spano's vehicle and placed in the Akron Police Department's Property Room, where it remains. (*Id.* ¶¶ 5, 7.) He further represents that he has personally examined the IVS and that the "only recording on the hard drive for September 25, 2015 was a single file with 0 Kbytes of data.") (*Id.* ¶ 6.) Lemmon Sr.'s speculation that there is a recording and that it supports his claims is contradicted by the record.

aggressive move in either her affidavit or her interview. Yet, she never stated that William did not take an aggressive step toward Sergeant Armstead, nor was she asked that in her interview. The Court finds that Officer Forney's silence on this subject does not rise to the level of a contradiction of the affidavits of Sergeant Armstead and Officer Patrick, and cannot, therefore, be relied upon to manufacture a question of fact. *See, e.g., Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 405 (6th Cir. 2007) (Officers' silence in police report as to their whereabouts at the time of the shooting did not create a genuine issue of material fact on the subject.)[5] Moreover, Officer Forney does indicate, consistent with the other officers, that William suddenly dropped his bike immediately prior to Sergeant Armstead using deadly force, and further that she believed in that moment that William was either going to "pull a gun out[] or run." (Forney Aff. ¶ 7.) Like the other officers, Officer Forney assessed the situation as dangerous. Even if she may not have seen the aggressive movement, that would not have created a genuine issue of material fact.[6] *See Chappell*, 585 F.3d at 914 (fact that some witnesses did not hear the officers announce themselves before entering did not create a genuine issue of fact).

Lemmon Sr. also takes issue with Sergeant Armstead's initial identification of William as one of the two assailants, relying on the fact that the police radio traffic after the robbery

---

[5] Of course, Lemmon Sr. could have deposed Officer Forney and directed to her the question of whether William made such a movement. He elected not to do so, at his own peril.

[6] Lemmon Sr. also relies on Officer Forney's representation in her interview that William "would not for anything take his hand out of his waistband." (MSJ Opp'n at 209, citing Doc. No. 27-4 (Transcript of Interview of Officer Dawn Forney ["Forney Tr."]) at 272.) He argues that this establishes that there was no threat that William would use a weapon. Lemmon Sr. lifts the sentence out of context. Prior to the question at issue, Officer Forney was asked what happened, and she explained that William would not comply with her instructions to take his hand out from his pants. (*Id*. at 266 ["And he . . . put his right hand up to his waistband . . . and he would not take his hand out we were all giving commands you know, "Take your hand out! Let me see your hands."].) Later in the interview she was asked to return to the moment when she was giving William commands and then he dropped his bike. While she noted that William would not remove his hands from his pants [clearly referring to the response to her commands to show his hands], she also explained that, "I'm thinking that he is either gonna [sic] pull the gun out or run, I wasn't sure what he was doing by making that movement of dropping the bike it just happened so fast[.]" (*Id*. at 272.)

suggested that the robbers were wearing jeans and William was actually wearing sweats or jogging pants.[7] (Opp'n at 199.) According to Lemmon Sr., there is a "genuine material issue of fact of what type pants [William] was actually wearing." (*Id*. at 204.) He appears to argue that there is a fact dispute as to the reasonableness of Sergeant Armstead's use of force because he erred, in the first place, by pursuing William. Lemmon Sr.'s argument misses the mark.

The Sixth Circuit has made clear that courts are to apply a segmented approach in analyzing the reasonableness of an officer's actions. *Livermore*, 476 F.3d at 406 ("The proper approach under Sixth Circuit precedent is to view excessive force claims in segments.") (citations omitted). Under this approach, the reasonableness of the use of deadly force is measured from the moments immediately leading up to the use of force. *Mullins*, 805 F.3d at 766 ("Thus, in analyzing the reasonableness of [the officer's] use of force, we must look at [the suspect's] behavior immediately prior to the moment he was shot."); *see Chappell*, 585 F.3d at 914 (noting that the "events before the shooting are not a factor in determining whether the detectives had probable cause to use deadly force once they entered the [suspect's] bedroom") (citing, *inter alia*, *Livermore*, 476 F.3d at 406-07). Here, the crucial time period includes the moments immediately preceding the use of deadly force. Sergeant Armstead's prior decision to pursue the individual he saw on the bicycle does not factor into the reasonableness equation. *See, e.g.*, *Claybrook v. Birchwell*, 274 F.3d 1098, 1104-05 (6th Cir. 2001) (applying temporally segmented analysis to alleged erroneous actions taken by officer and finding that any error that preceded the shooting "segments" to be immaterial).

---

[7] Lemmon Sr. also questions the reasonableness of Sergeant Armstead's belief that William was armed based upon his own opinion that "[t]here is absolutely no way to suspend a gun in sweatpants/jogging pants." (Opp'n at 203.) Such a comment is unfounded speculation that finds no support in the record.

For the same reasons, the Court rejects Lemmon Sr.'s suggestion that Sergeant Armstead created the dangerous situation by failing to take a position of safety when he approached the scene. He argues that "[i]t goes without saying that if Sgt. Armstead had retreated to cover behind his car door as did Officer Forney[8] then the 'alleged' imperative danger that lead [sic] to the shooting would have dissipated."[9] (Opp'n at 208 (footnote added).) However, the Sixth Circuit has expressly rejected such an analysis, and has cautioned against placing emphasis on prior police tactical decisions leading up to the use of force.[10] *See Livermore*, 476 F.3d at 406 (rejecting analysis in Ninth Circuit decision that an officer's use of force cannot be reasonable if he acted recklessly in creating the circumstances which required the use of force) (collecting cases); *see also Chappell*, 585 F.3d at 909 (approving of district court's decision that the manner in which detectives obtained and executed search warrant was not relevant in assessing the

---

[8] There is no evidence that Officer Forney retreated. The Court believes that Lemmon Sr. is referring to Officer Patrick, who stated in his affidavit that he took a position of non-lethal cover because other officers had already established lethal cover of the suspect. (*See* Patrick Aff. ¶ 9.)

[9] Lemmon Sr. relies on the Sixth Circuit's decision in *Sigley* to advance an "officer created danger" standard. The court in *Sigley* never endorsed such a standard. Instead, the court merely acknowledged the plaintiff's reliance on the Seventh Circuit's decision in *Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993). *See Sigley*, 437 F.3d at 534-35 ("The Plaintiff relies on [*Enyart*] to support his argument."). The court in *Sigley* denied the officer summary judgment on the question of qualified immunity because there was a question of fact as to whether the decedent swerved his vehicle to hit the officer, or whether the officer, in the moments preceding the shooting, chose to run alongside the vehicle and point his gun at a fleeing suspect. The court found that this factual dispute meant that it was not clear "whether [the officer] had probable cause to believe that [the suspect] posed a significant threat of death or serious physical injury to others." *Sigley*, 437 F.3d at 536.

[10] It is worth noting that a police officer is not required to retreat before a display of force. *Estate of Edwards by Edwards v. United States*, No. 93-1365, 38 F.3d 1215 (table decision), 1994 WL 577394, at *4 (6th Cir. Oct. 17, 1994) ("unlike the private citizen a police officer, by the necessity of his duties, is not required to retreat before a display of force by his adversary") (quotation marks and citations omitted). Further, to the extent that Lemmon Sr. relies on the fact that Officer Patrick averred that his training and experience led him to assume non-lethal cover, *see* Patrick Aff. ¶ 9, the failure to follow an internal policy or procedure does not defeat qualified immunity. *See Davis v. Scherer*, 468 U.S. 183, 194, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984) (Officials "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Claybrook*, 274 F.3d at 1105 (violation of police procedure regarding the approaching of suspects did not factor into the use of force analysis).

objective reasonableness of their eventual use of force).[11]

Applying a segmented approach, and focusing on the moments immediately preceding the use of force, the Court finds that it was objectively reasonable for Sergeant Armstead to use deadly force against an individual who had already exhibited behavior that suggested he was armed, who was actively resisting, and who had made a sudden movement toward the officers. Regardless of what took place in the segments of time preceding the shooting, and notwithstanding the benefit of the hindsight knowledge that William was actually unarmed, the officers at the scene were faced with a rapidly escalating and dangerous situation. Under these circumstances, the Court cannot (and will not) second guess the decision to use deadly force.[12] Further, because a reasonable fact-finder, viewing the facts in the light most favorable to Lemmon Sr., could not find that Sergeant Armstead violated William's constitutional rights, Sergeant Armstead is entitled to qualified immunity for the claims of excessive force and unreasonable seizure.

B.  *Monell* **Liability and Ratification**

Lemmon Sr. seeks to hold the City and Chief Nice liable under a theory that the policy and customs implemented by the City resulted in a deprivation of William's constitutional

---

[11] Of course, Lemmon Sr. offers nothing more than his own opinion that Sergeant Armstead should have assumed a position of safety relative to William. However, the Sixth Circuit has also cautioned that courts "must avoid substituting [their] personal notions of proper police procedure for the instantaneous decision of the officer at the scene." *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000) (quotation marks and citation omitted).

[12] Lemmon Sr. suggests that Sergeant Armstead opened fire on an individual with "known mental issues." (Opp'n at 207.) He fails to point to any record evidence that, if believed, would establish that William suffered from any mental illness or, importantly, that Sergeant Armstead was aware of any such illness. Once again, Lemmon Sr.'s unsubstantiated remark does not make it so and does not constitute competent evidence on summary judgment.

rights.[13] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). However, "the constitutional violation of a municipal official is a prerequisite to municipal liability." *Pollard*, 780 F.3d at 404 (citing *Weeks v. Portage Cty. Exec. Officers*, 235 F.3d 275, 279 (6th Cir. 2000)). Because the Court has determined that William's constitutional rights were not violated by the use of force employed against him, defendants are entitled to summary judgment on plaintiff's claims of municipal liability. *See, e.g., Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citation omitted); *Pollard*, 780 F.3d at 404 (citation omitted); *see also Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) ("Neither *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.")

However, even if the Court were to reach the issue of *Monell* liability, defendants would still prevail. In opposition to defendants' dispositive motion, Lemmon Sr. rests his arguments that the City and Chief Nice are subject to municipal liability exclusively on a theory of ratification, under which "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is

---

[13] Chief Nice is only sued in his official capacity as Chief of Police for the Akron Police Department. (*See generally* Compl.) Official capacity suites merely represent another way of pleading an action against a municipality or other governmental entity. *See Ky. v. Graham*, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (quotation marks and citation omitted).

final."[14] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988). Lemmon Sr. argues that the City ratified Sergeant Armstead's acts by conducting "a very perfunctory investigation." (Opp'n at 212.) In support, he suggests that the interviewing officers should have asked Sergeant Armstead "tough questions" and should have "pressed" him as to why he did not retreat to a place of safety. He also faults the City for failing to secure Sergeant Spano's dash cam video and for neglecting to ensure that Officer Forney's dash cam was working properly.[15] (Opp'n at 212.)

A municipality's failure to investigate constitutional deprivations and to discipline offending officers appropriately can ratify misconduct, giving rise to liability under 42 U.S.C. § 1983. *See e.g., Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985). But to make out such a claim, "the plaintiff 'must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'" *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)); *see also McClendon v. City of Detroit*, 255 F. App'x 980, 983 (6th Cir. 2007) (applying "deliberate indifference" standard to ratification claim); *Black v. City of Memphis*, No. 98-6508, 215 F.3d 1325 (table decision), 2000 WL 687683, at *3-4 (6th Cir.

---

[14] The third claim in the complaint seeks to hold the City and Chief Nice liable, under 42 U.S.C. § 1983, for failure to train and supervise. Lemmon Sr. offers no argument in opposition to defendants' position that the City does not have an express policy of directing its officers to use excessive force and that there is nothing in the record to demonstrate that the fatal shooting of William was anything more than an isolated incident. (*See* MSJ at 143.) Accordingly, Lemmon Sr. has abandoned that claim. Moreover, the record does not support a finding that the City deliberately failed to provide training to its police officers after receiving complaints of constitutional violations stemming from the use of deadly force by its officers, or that the City ignored foreseeable consequences in failing to provide that training, and summary judgment for defendants is appropriate on this claim. *See Fox v. Van Oosterum*, 176 F.3d 342, 348 (6th Cir. 1999).

[15] In her interview, Officer Forney stated that her police vehicle had a dash cam but that it was not working on the day of the shooting. (Forney Tr. at 274.) She did not know when it had been checked prior to September 25, 2015, and there is nothing in the record to show that the City was aware that it was not functioning.

May 19, 2000) (same).

In support of his ratification claim, Lemmon Sr. relies on *Wright v. City of Canton*, 138 F. Supp. 2d 955 (N.D. Ohio 2001). In *Wright*, the plaintiff was treated for injuries he purportedly received during an altercation with police. The treating physician filed a complaint with the police department because he questioned the officers' account of how the plaintiff received his injuries. The police chief conducted an internal investigation but failed to interview the treating physician regarding the plaintiff's injuries or the behavior of the officers on the night in question that led to the filing of the police complaint. The court denied the city summary judgment, finding that the plaintiff offered "evidence showing the investigation was not designed to discover what actually happened to [the plaintiff] while in [the officers'] custody." *Id*. at 966; *see Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241 (6th Cir. 1989) (municipal liability where a sheriff failed to investigate a paraplegic inmate's inadequate medical care and punish those responsible); *Marchese, supra* (sheriff ratified officers' actions in permitting a prisoner to be beaten in his cell by failing to conduct an investigation and discipline the officers).

In contrast to *Wright*, Lieutenant Whiddon conducted a thorough internal homicide investigation wherein he interviewed all of the officers who responded to the scene of the shooting and collected relevant evidence, including video and audio recordings, police reports, physical evidence, and witness statements. He ultimately presented the results of his investigation to the county prosecuting attorney for an independent determination as to whether criminal charges should issue. That Lemmon Sr. believes that the interview questions could have been more intense and disagrees with the outcome of the investigation does not amount to

evidence of deliberate indifference.[16] *See Walker v. Norris*, 917 F.2d 1449, 1457 (6th Cir. 1990) (finding no municipal liability where investigation was undertaken); *King v. City of Eastpointe*, 86 F. App'x 790, 804 (6th Cir. 2003) (finding that "actions by the City do not amount to the 'deliberate indifference' necessary for municipal liability under a theory of ratification" where the City investigated the incidents).

Of course, even if the Court were to find the investigation into the shooting death of William inadequate (which it does not), that fact would still not defeat summary judgment because Lemmon Sr. has failed to point to any evidence that would demonstrate that any flaws "in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the [City] knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the [City's] custom was the cause of the [constitutional violation] here." *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005) (citing *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)). "*Doe* makes clear that the plaintiff bears a heavy burden in proving municipal liability, and he cannot rely solely on a single instance to infer a policy of deliberate indifference." *Id.* at 433; *see Doe*, 103 F.3d at 508 ("There is an analytical distinction between being deliberately indifferent as to one particular incident, and having a 'policy' of always being deliberately indifferent to unconstitutional actions.").

Here, Lemmon Sr. has presented no evidence of the City's failure to investigate past instances of excessive force such that a reasonable jury could find a policy or custom of deliberate indifference to the constitutional rights of its citizens. *See Fox*, 176 F.3d at 348 (failure

---

[16] Of course, the fact that Sergeant Armstead was not asked why he failed to seek a position of safety does not suggest that the investigation was inadequate as the Court has already determined that Sergeant Armstead had no such duty. Likewise Lemmon Sr.'s reference to Sergeant Spano's dash cam video is unavailing as the record establishes both that the City did secure the video and that it did not contain footage of the shooting incident.

to investigate incident did not give rise to municipal liability when "[plaintiff] has not presented evidence indicating that [the sheriff's] decision was either part of a county policy or custom of refusing to investigate meritorious claims or anything other than an isolated, one-time event"); *Dorsey v. City of Detroit*, 858 F.2d 338, 345 (6th Cir. 1988) (finding no municipal liability where "[t]here is no evidence . . . that it was the custom or policy of the City of Detroit to instigate or condone violation of citizens' constitutional rights" and "no suggestion that" the City adopted "procedures to safeguard citizens' interests during arrests" "were customarily ignored").

C.     **State Law Claims and Tort Immunity**

Section 2744 of the Ohio Revised Code extends to municipalities immunity from tort liability for governmental and propriety functions. Ohio Rev. Code § 2744.02(A)(1); *Chesher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007). It is well settled that "government functions" include the operations of law enforcement. *See* § 2744.01(C)(2)(a); *Harris v. Sutton*, 918 N.E.2d 181, 185 (Ohio Ct. App. 2009). There are, however, certain exceptions to the general grant of immunity spelled out in the statute. Specifically, immunity is not available to a municipality where: (1) injury or damage is caused by a municipal employee's negligent operation of a motor vehicle [§ 2744.02(B)(1)], (2) the losses are due to the negligent performance of employees with respect to proprietary functions of a political subdivision [§ 2744.02(B)(2)], (3) damages are the result of a municipality's negligent failure to keep public roads in repair [§ 2744.02(B)(3)], (4) damages are the result of a physical defect on the grounds of public buildings used for government functions [§ 2744.02(B)(4)], and (5) civil liability is expressly imposed by another provision of the Ohio Revised Code [§ 2744.02(B)(5)].

Based on the undisputed record facts regarding the incident leading to the shooting death

of William, there can be no doubt that the City and Chief Nice (who is only sued in his official capacity) qualify for immunity under Ohio Rev. Code § 2744.02(A)(1), as the City's police officers were engaged in the governmental function of police activities at the time of the shooting on September 25, 2015. Further, there are no exceptions that would apply to the circumstances as they are known following the period of discovery. Thus, to the extent that the City and Chief Nice are sued under state law, they are entitled to immunity for the state tort claims of assault and battery, intentional infliction of emotional distress, and wrongful death. *See generally Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 744 (N.D. Ohio 2008) ("Ohio courts have held that political subdivisions are entitled to immunity under § 2744.02 for the intentional torts committed by their employees.") (collecting cases).

Ohio Rev. Code § 2744 also provides immunity for tort actions for employees of political subdivisions, provided their acts and omissions were not "manifestly outside the scope of the employee's employment or official responsibilities" or were taken "with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" Ohio Rev. Code § 2744.03(A)(6)(b). "Malice" is the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F. Supp. 2d 612, 629 (S.D. Ohio 2004) (citations omitted). "Bad faith" includes a "dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id.* "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (citation omitted). "Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is

unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*.

Based on the same analysis presented above with respect to federal qualified immunity, the Court concludes that there are no genuine issues of material fact and that Sergeant Armstead is entitled to immunity from liability in connection with the state law claims. In the same way in which Lemmon Sr. failed to demonstrate that Sergeant Armstead's actions were objectively unreasonable, he has also failed to show that Sergeant Armstead acted with "malicious purpose, in bad faith, or in a wanton or reckless manner." *Chappell*, 585 F.3d at 916 n.3 (holding that failure to prove objective unreasonableness to avoid qualified immunity under 42 U.S.C. § 1983 also defeated claim for qualified immunity under Ohio law); *see Pollard*, 780 F.3d at 404 ("If the officers were objectively reasonable in shooting Bynum, it logically follows that they could not have been reckless in shooting Bynum"); *Mullins*, 805 F.3d at 769 ("Because we find that [the officer's] use of deadly force was not objectively unreasonable under the circumstances, it follows that he did not act with 'malicious purpose, in bad faith, or in a wanton or reckless manner,' as required to avoid statutory immunity under Ohio law.") (quoting Ohio Rev. Code § 2744.03(A)(6)(b)).

## IV. CONCLUSION

The undisputed record compels the Court to conclude that the shooting death of William, though unfortunate, was not the result of a violation of his constitutional rights. Such a finding entitles Sergeant Armstead to qualified immunity and prevents Lemmon Sr. from continuing to prosecute the claims in his complaint.

Accordingly, and for all of the foregoing reasons, defendants' motion for summary judgment is **GRANTED**. This case is dismissed.

**IT IS SO ORDERED**.

Dated: May 18, 2018

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**